[No. 19342. Department One. July 15, 1925.]

MACKINTOSH-TRUMAN LUMBER COMPANY, *Respondent,* v. G. W. SCOTT *et al., Appellants.*[1]

PAYMENT (29)—APPLICATION — RATIFICATION OF PAYMENT — EVIDENCE—SUFFICIENCY. Findings that a payment made by S, was a repayment of an advance to him by K, and that application thereof to the account of K was ratified, are sustained, although it was not expressly authorized, where P had been making such advances, a voucher against S included the item owed by P, and, when S was notified of the application thereof to the account of P, he seemed satisfied.

MECHANICS' LIENS (17)—RIGHT TO LIEN—DELIVERY OF MATERIALS —EVIDENCE. A mechanic's lien foreclosure properly includes an item for lumber, ordered by the contractor for the building and left on the premises, although the owner told the truck driver not to leave it, where the owner knew it was left and gave the seller no notice and took no steps to protect himself.

Appeal from a judgment of the superior court for King county, Marion Edwards, judge *pro tempore,* entered December 13, 1924, in favor of the plaintiff, in

[1]Reported in 237 Pac. 735.

an action to foreclose a materialman's lien, tried to the court. Affirmed.

*Wright, Froude, Allen & Hilen, J. Speed Smith,* and *Henry Elliott, Jr.,* for appellants.

*Reynolds, Ballinger & Hutson,* for respondent.

BRIDGES, J.—This is an appeal from a decree foreclosing a materialman's lien for something less than $700.

There is little in the case but a dispute of facts. The appellants claim that the material bill has been paid; the trial court found to the contrary. We have read all the testimony and find the outstanding facts to be these: The appellants Scott and one Payne owned adjoining lots in the town of Auburn. They were close friends. The appellants had entered into a contract with a man by the name of Cramer to construct a building on their lot, to cost about $11,000. The builder was to furnish the material and labor. Shortly after the Scott contract was made, Payne, who owned the adjoining lot, also made a contract with Cramer to erect a building on his lot. For the most part, the two buildings were constructed at the same time and substantially as one structure, although the first work was done on the Scott building. They (the Scotts) did not have the ready money to pay for the work as it progressed, and therefore made arrangements for a loan from a loan association in Seattle. The understanding was that the money thus borrowed would be paid out by the loan company on vouchers drawn by Cramer, the builder, OK'd by Scott. There was some delay in consummating the loan, and it satisfactorily appears that Payne, who had ready money, advanced certain sums to be paid for labor and material that went into the Scott building. The respondent furnished the materials to Cramer for the construction of both the Scott

and the Payne buildings.. All items were charged to Cramer, but were kept segregated as to the Scott and Payne buildings.

The main dispute rises out of the following circumstances: Cramer, the builder, made up a written statement or voucher for Mr. Scott, showing an item of $2,487.55 owing to the respondent on account of lumber furnished. This voucher was OK'd by Mr. Scott and presented by Cramer to the loan company, which drew a check to the respondent for the amount indicated. Cramer delivered the check to the respondent and requested that of the amount $714 should be applied towards the Payne account and the balance towards the Scott account. It appears that the lumber furnished to the Payne building for a designated month amounted to the sum of $714, and the bill for the Scott building during the same month amounted to the balance of the check. In other words, the bill represented the value of lumber furnished for both buildings. Mr. Scott contends that when he OK'd the bill he supposed it was for lumber for his building, that he never authorized any of his money to be paid on the Payne account and that respondent should give him credit for the $714, which would more than discharge the amount of the lien claim.

The real question in the case is whether the respondent had a right to apply $714 of appellant's money towards the Payne account.

It would not serve any good purpose to here give the details of the testimony. It is peculiarly conflicting, as well as unsatisfactory. While we think that the appellant at no time expressly authorized the credit mentioned, we are of the opinion that the preponderance of the evidence shows that they knew that Payne had made advancements for them and that he was to be repaid out of the moneys which they were later to ob-

tain from the loan company; that there was probably
a tentative understanding that this repayment would,
at least to some extent, be made by applying certain of
those moneys in payment of the Payne bill.  This con-
clusion is strongly supported by the fact that it is
shown with fair clearness that when Scott learned that
$714 of his money had been applied to the Payne ac-
count he seemed to be satisfied with it.  It is true, he
testified that he expressed his dissatisfaction, but the
testimony of two or three other witnesses seems to
show quite conclusively that he was mistaken in this
regard.  While there may not have been any express
agreement to bind the Scotts to pay the $714 on the
Payne account, we agree with the trial court that there
was at least a ratification of that payment.  Inasmuch
as Mr. Scott knew that Mr. Payne had advanced
moneys for him, it would be but natural that there
would be an understanding that, when Mr. Scott got
his money from the loan company, he would repay
those advancements either directly or in the manner
indicated here.

We are content to allow the judgment of the trial
court in this regard to stand.

One other small matter remains to be disposed of.
In the first place, it was the understanding that the
flooring of the Scott building would be made of lumber,
but later it was determined to use some composition
flooring, thus making it unnecessary to have flooring
lumber.  It appears that the respondent did not know
of this change and, under the order from Cramer, the
builder, delivered at the Scott premises a load of floor-
ing of the value of a little less than $200.  Scott testi-
fies that, when this lumber arrived, he told the truck
driver that he could not use it and did not want it left.
On the contrary, the driver testified that while some-

thing was said of that character, yet the foreman of the job told him to leave the lumber, and this he did, taking a receipt therefor from the foreman. It appears that this lumber was not used in the building. It was probably taken away by Cramer to another building which he was constructing. Of none of these facts, however, did the respondent have knowledge.

It is plain that Cramer, the building agent of the Scotts, ordered the lumber of the respondent, who delivered it. If Mr. Scott had no use for the lumber he should have seen to it that it was not left at his premises, or have called the matter to the attention of the respondent. This he seems not to have done. All the testimony shows in this regard is that, when the lumber arrived, he told the driver of the truck that he did not want it and not to leave it. Being constantly on the ground, he must have known that the lumber had been left and he should have taken steps to protect himself in the matter. We are not disposed to interfere with the conclusions of the trial court in reference to this lumber.

The trial court had the witnesses before it and we ought not to reverse his conclusions unless we can satisfy ourselves from the reading of the testimony that the preponderance of the evidence was to the contrary. This we cannot do. The judgment is affirmed.

TOLMAN, C. J., PARKER, ASKREN, and MAIN, JJ., concur.